UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEPHANIE FORD STEWART,<br><br>Plaintiff,<br><br>v.<br><br>SCREEN GEMS-EMI MUSIC, INC., et al.,<br><br>Defendants. | Case No.  14-cv-04805-JSC<br><br>**ORDER RE:  MOTIONS TO DISMISS**<br><br>Re: Dkt. No. 9, 12 |

Plaintiff Stephanie Ford Stewart ("Plaintiff") alleges that Defendants wrongfully withheld publishing royalties to the song "Daydream Believer," which Plaintiff's late husband, John Stewart ("Stewart"), wrote.  The claims arise out of a 1967 songwriter's agreement between Stewart and Screen Gems-EMI Music, Inc. ("Screen Gems-EMI").[1]  The agreement is a "net receipts" arrangement, which means that the publisher is only obligated to remit to the songwriter a certain percentage of the revenue the publisher actually receives after deducting any applicable fees and costs, in contrast to an "at source" agreement, which requires the publisher to remit to the songwriter a certain percentage of all revenue garnered from the territory even before deducting fees and costs.  The crux of Plaintiff's claims is that Defendants are taking advantage of the "net receipts" arrangement to Plaintiff's detriment.

To that end, Plaintiff contends that Defendants have been deducting from the song's foreign receipts fees Screen Gems-EMI paid to affiliated foreign sub-publishers that are alter egos of Screen Gems-EMI and operate with Screen Gems-EMI as part of a single enterprise; that is,

---

[1] As explained in further detail below, the Agreement was actually executed between Stewart and Screen Gems-EMI's predecessor-in-interest, Screen Gems / Colgems.  The Court will refer to Screen Gems-EMI as a party to the contract throughout this Order.

United States District Court<br>Northern District of California

1  that Screen Gems-EMI is effectively *paying itself* and then deducting those payments from the

2  receipts to reduce the "net receipts" and thus the royalty amount paid to Plaintiff.  Plaintiff also

3  complains that the fees Screen Gems-EMI pays to its foreign sub-publishers are grossly above

4  market rate and that Screen Gems-EMI is improperly deducting agency fees from the revenue

5  from domestic sales, undercutting Plaintiff's royalties in this context as well.

6         Presently before the Court are Defendants' motions to dismiss.  All three Defendants move

7  to dismiss for failure to state a claim upon which relief can be granted (Dkt. Nos. 9, 12), and

8  Defendants EMI and EMI North America move to dismiss for lack of personal jurisdiction (Dkt.

9  No. 12).  Having considered the parties' submissions and having had the benefit of oral argument

10  on February 5, 2015, the Court GRANTS EMI and EMI North America's 12(b)(2) motion and

11  GRANTS IN PART and DENIES IN PART Screen Gems-EMI's 12(b)(6) motion.  At bottom, the

12  Court concludes that the case may proceed against Screen Gems-EMI.

**BACKGROUND**

13

14  **A.      Complaint Allegations[2]**

15         Plaintiff Stephanie Ford Stewart ("Plaintiff") is the widow of John Stewart ("Stewart"), a

16  songwriter who penned the song "Daydream Believer." (Dkt. No. 1-1 ¶ 1.)  Daydream Believer

17  initially became a hit in 1967 when the Monkees recorded and released the song, and it was later

18  recorded on other albums, including 2009's top-selling album of the year.  (*Id.* ¶¶ 17, 20-21.)

19  Stewart passed away in 2008, so Plaintiff brings this action on behalf of her husband's trust, which

20  owns the rights to Stewart's songs, including Daydream Believer.  (*Id.* ¶¶ 5, 22.)

21         In 1967, Stewart entered a songwriter's agreement ("the Agreement") with music

22  publishing company Screen Gems-Columbia Music, Inc.; among other things, the Agreement

23  governs payment of royalties.  (*Id.* ¶¶ 6, 18.)  Defendant Screen Gems-EMI is the successor-in-

24  interest to Screen Gems-Columbia Music (*id.* ¶ 7), and does business, along with all related

25  companies, as "EMI Music Publishing." (*Id.* ¶ 11.)  Pursuant to the Agreement, Stewart assigned

26  his rights in Daydream Believer to Screen Gems-EMI in exchange for Screen Gems-EMI 's

27

28  _____

[2] Except where otherwise noted, the following facts are taken from the FAC.

2

United States District Court
Northern District of California

agreement to pay royalties to Stewart.  (Dkt. No. 1-1 ¶ 19.)  Paragraphs 3d and 3e of the

Agreement provide in relevant part:

> 3.      In consideration for and in full payment of the aforesaid sale, the Publisher hereby agrees to pay the following royalties jointly to the Composers with respect to the musical composition:
>
> . . .
>
> d)      **FIFTY (50%) percent of any and all net sums actually received by the Publisher** from the mechanical rights, electrical transcription and reproducing rights, motion picture synchronization and television rights, **and all other rights (except as otherwise specifically provided for herein) therein in the United States and Canada**, except that the Composers shall not be entitled to share in any sum or sums received by the Publisher from ASCAP or BMI or any public performance rights organization which pays performance fees directly to songwriters.
>
> e)      **FIFTY (50%) percent of any and all net sums actually earned and actually received by the Publisher from the sales and uses** (other than public performance[ ] uses for which Composers are paid by any public performance rights organization) of the musical composition **in countries outside of the United States and Canada**.

(Dkt. No. 1-1 at Ex. A ¶ 3 (emphasis added).)

Screen Gems-EMI collects song royalties generated outside of the United States and

Canada through sub-publishers.  Screen Gems-EMI uses affiliated foreign sub-publishers that are

"alter egos of one and another and form a single enterprise." (*Id.* ¶ 34.)  EMI Music Publishing

permits its own alter ego foreign sub-publishers to retain 50% of the collected foreign royalties

(instead of the market rate of 10%), and thus only remits 50% of the amount collected to Screen

Gems-EMI. (*Id.* ¶¶ 29, 31.)  Because the foreign sub-publishers are essentially one and the same

as Defendants, Defendants have an incentive to shift more revenue to the foreign affiliates so that

Screen Gems-EMI's "net amount actually received"—*i.e.*, the amount that it must split equally

with Plaintiff pursuant to the Agreement—becomes much smaller.  (*See id.* ¶ 27.)  As a result,

Plaintiff has lost out on hundreds of thousands of dollars of revenue from foreign sales.

Screen Gems-EMI's second set of allegations pertains to the royalty payments from sales in the United

States and Canada ("domestic" revenue) as it relates to Paragraph (d) of the Agreement.  That

provision requires Screen Gems-EMI to remit to Plaintiff 50% "of any and all net sums actually

United States District Court
Northern District of California

1    received" from certain enumerated rights "and all other rights (except as otherwise specifically

2    provided for herein)" from domestic revenue.  (Dkt. No. 1-1 at Ex. A ¶ 3.)  The Agreement does

3    not address whether Defendants "may delegate their obligation to collect [domestic] mechanical

4    royalties to third party collection agents, such as Harry Fox Agency and the Canadian Musical

5    Reproduction Rights Agency [("CMMRA")], and then deduct those agents' fees from the gross

6    before calculating Plaintiff's 50% share."  (Dkt. No. 1-1 ¶ 37.)  It is industry practice to explicitly

7    state such a right in a publishing contract if the parties have so agreed, and there is no such

8    provision in the Agreement, but Defendants have nonetheless been deducting such fees at a rate of

9    7.5 to 8.5% of their "net sums actually received."  (*Id.* ¶¶ 37-38.)

10        Finally, Defendants have also "been deducting phony 'collection agency fees' from

11   mechanical royalties paid directly to Defendants by record labels such as" SONY/ATV, when

12   these fees were not collected by an agent at all.  (*Id.* ¶ 39.)

13        Defendants concealed the above practices by sending Plaintiff royalty statements that were

14   "confusing at best and misleading at worst" and "did not clearly disclose that the foreign affiliates

15   were deducting 50% of the foreign income before sending the money" to Screen Gems-EMI.  (*Id.*

16   ¶ 40.)  Plaintiff discovered Defendants' wrongdoing on or about August 10, 2014, when she

17   retained an accountant to review Defendants' source record.  (*Id.* ¶ 41.)

18   **C.    Jurisdictional Allegations[3]**

19        Screen Gems-EMI and EMI North America are both Delaware corporations with their

20   principal places of business in New York City.  (*Id.* ¶¶ 6, 9; Dkt. No. 13 ¶ 7.)  EMI is a

21   multinational company headquartered in London, United Kingdom.  (Dkt. No. 1-1 ¶ 8; Dkt. No.

22   13 ¶ 3.)  EMI does business exclusively in the United Kingdom and Germany.  (Dkt. No. 13 ¶ 3.)

23   Neither EMI nor EMI North America maintains an office or employees in California, has a bank

24   account or telephone number in California, owns, administers, or exploits any musical

25   compositions in California.  (Dkt. No. 13 ¶¶ 4-5, 7, 9.)  Further, EMI has no agent for service of

26

27   ───────────────

28   [3] The following facts are taken from the FAC along with certain affidavits and documentary
     evidence submitted in support of, and in opposition to, EMI and EMI North America's motion to
     dismiss for lack of personal jurisdiction.

─────────────── (left margin, vertical) United States District Court / Northern District of California ───────────────

United States District Court
Northern District of California

1  process in California, nor does it own real or personal property in the state.  (*Id.* ¶ 5.)  Defendants

2  also offer evidence that neither EMI nor EMI North America "transact any business in California."

3  (Dkt. No. 13 ¶¶ 4, 7.)

4  Screen Gems-EMI and EMI North America share an office in New York, and have the

5  same President, CEO, and Secretary: David Johnson.  (Dkt. No. 13 ¶ 1; Dkt. No. 22-1 ¶¶ 4-6 &

6  Exs. B-D.)  The same person, Francis Crimmins, serves as CFO of Screen Gems-EMI and a

7  director of EMI and EMI North America.  (Dkt. No. 22-1 ¶¶ 4-6 & Exs. B-D.)  These two

8  individuals, Johnson and Crimmins, are the sole directors of EMI.  (*Id.* ¶ 6 & Ex. D.)

9  Plaintiff contends that Defendants are all part of a single enterprise doing business as "EMI

10  Music Publishing" (Dkt. No. 1-1 ¶ 11), which Defendants note is not an existing legal entity, but

11  rather a name used to refer to the collection of over 100 companies formerly owned by a single

12  entity.  (Dkt. No. 11 ¶ 1 n.1 (noting that "EMI Music Publishing" is a "shorthand name used to

13  refer to the music publishing companies that were formerly owned by EMI-Group, Plc, which was

14  an United Kingdom public company and which are currently owned by a consortium of investors

15  including Sony Corporation of America.").)  The evidence indicates that a variety of EMI-related

16  entities, including Defendants in this case, use the name "EMI Music Publishing" without

17  identifying a particular company.

18  In accordance with that practice of referring to EMI entities collectively, Audrey Ashby,

19  the individual responsible for maintaining EMI Music Publishing's business records, avers that

20  she used to work for "EMI music publishing companies" and now maintains their records, without

21  referring to particular companies.  (Dkt. No. 11 ¶¶1-2.)  To that end, SONY/ATV, which is among

22  the "consortium of investors" that acquired the EMI companies (and for whom Ms. Ashby works),

23  provides administrative business services for the EMI companies, including Screen Gems-EMI,

24  EMI, and EMI North America. (Dkt. No. 11 ¶ 1 & n.1; Dkt. No. 13 ¶ 2.)

25  Royalty statements that Plaintiff received for sales of Daydream Believer contain the

26  names of various EMI entities:  from the general "Emi Music Publishing," to "Screen

27  Gems/Colgems," "Screengems," and or EMI North America, in some cases all on the same royalty

28  statement.  (Dkt. No. 1-1 ¶ 33.)  The cover letter accompanying the royalty statements are from

5

executives of "North American Operations/EMI Music Publishing" or "Global Services, North American Operations, EMI Music Publishing." (*See, e.g.*, Dkt. No. 21-2 at 4.) Each recent royalty statement has the name "EMI MUSIC PUBLISHING NORTH AMERICA" in the footer, along with address, phone number, and the email usa.royaltydept@emimusicpub.com." (*See, e.g.*, Dkt. No. 21-2 ¶ 2 & Ex. A.) However, Thomas F.X. Foley, Vice President for Royalty Administration and Analysis, North America, for Sony/ATV Publishing LLC ("SATV"), asserts that the reference to EMI Publishing North America on the statements "has nothing to do with [EMI North America]" but is "simply a geographic designation, for the United States music publishing business." (Dkt. No. 33 ¶ 23.)

Finally, Plaintiff's royalty payments are sent from a bank account listed as either "EMI Ent WI" or "EMI Ent World." (Dkt. No. 21-2 ¶ 3 & Ex. A.) The company referred to is EMI Entertainment World, Inc., a Delaware corporation located at the same New York address as Screen Gems-EMI and EMI North America. (Dkt. No. 22-1 ¶ 10 & Ex. H.) The more than 100 EMI companies in the United States, including Defendants Screen Gems-EMI and EMI North America (but not EMI, which is based in the U.K.), all use EMI Entertainment World Inc.'s central bank account. (Dkt. No. 32 ¶ 8; Dkt. No. 34 ¶¶ 4-6.) Although their banking and administrative services are consolidated, each EMI company is charged a certain amount for services provided on its behalf and receives its own financial statements reflecting its individual income and expenses. (Dkt. No. 34 ¶¶ 4, 6.)

**B.     Procedural History**

Plaintiff initially filed this action in Marin County Superior Court, but Defendants removed the case to federal court pursuant to 28 U.S.C. § 1446(a). (*See* Dkt. No. 1 ¶ 4.) Plaintiff's FAC alleges five causes of action against all Defendants. In the first cause of action, Plaintiff alleges breach of contract, contending that Defendants' (1) practice of allowing foreign sub-publishers that are actually the alter egos of Defendants to retain 50% of foreign fees and (2) the practice of deducting agency commission fees before calculating and remitting the songwriter's share of domestic royalties breaches the parties' Agreement. (Dkt. No. 1-1 ¶¶ 42-50.) Plaintiff's second cause of action, for breach of the implied covenant of good faith and fair dealing, at bottom

United States District Court
Northern District of California

challenges Defendants' practice of not engaging in arms-length negotiations with sub-publishers to get lower fees and concealing their wrongdoing through misleading royalty statements.  (*See id.* ¶¶ 51-57.)  Similarly, Plaintiff's third cause of action alleges violations of California's unfair competition law, Cal. Bus. & Prof. Code § 17200.  (*Id.* ¶¶ 58-68.)  Plaintiff's fourth cause of action seeks declaratory relief in the form of an order declaring that Defendants have breached the Agreement and the implied covenant, that their conduct constitutes an unfair business practice, that they are alter egos of one another and form a single enterprise, and that they have concealed their wrongdoing through misleading royalty statements.  (*Id.* ¶¶ 69-72.)  Lastly, the fifth cause of action seeks an accounting to determine the appropriate amount of royalties that Defendants have withheld from Plaintiff.  (*Id.* ¶¶ 73-76.)  As a result of these allegations, Plaintiff seeks the following relief:  damages and restitution of at least $450,000; injunctive relief to prevent Defendants from continuing the aforementioned conduct; termination of the Agreement; imposition of a constructive trust; and attorneys' fees and costs.  (Dkt. No. 1-1 at 13-14.)

After removing the matter to federal court, Defendants filed motions to dismiss:  all Defendants contend that the FAC fails to state a claim upon which relief may be granted, while EMI and EMI North America contend that the Court lacks personal jurisdiction over them.  (*See* Dkt. Nos. 9, 12.)  With respect to the sufficiency of the FAC, Defendants all contend that Plaintiff fails to state a claim for breach of contract because the Agreement specifically allows for the practices that Plaintiff laments, which Defendants contend is evidenced by the plain language of the contract, the parties' decades-long course of performance, and what Defendants characterize as multiple courts' rejection of Plaintiff's argument.  Defendants contend that the remaining causes of action should meet the same fate, as they are entirely redundant of, and rise and fall with, Plaintiff's breach of contract claim.

In their separate motion, EMI and EMI North America contend that the Court lacks personal jurisdiction over them because they do not do any business in California—let alone enough to justify haling them into court here—and that no grounds exist to impute to them  Screen Gems-EMI's activities in and contacts with this state.

1

## LEGAL STANDARDS

2

**A.      Legal Standard on a 12(b)(2) Motion to Dismiss**

3         When a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff bears the

4   burden of demonstrating that the court has jurisdiction over the defendant.  *See Harris Rutsky &*

5   *Co. Ins. Servs., Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1128-29 (9th Cir. 2003).  "Where, as

6   here, a court decides a motion to dismiss for lack of personal jurisdiction without an evidentiary

7   hearing, the plaintiff need only make a prima facie showing of jurisdictional facts to withstand the

8   motion to dismiss."  *Longyu Int'l Inc. v. E-Lot Elects. Recycling Inc.*, 2:13-CV-07086-CAS, 2014

9   WL 1682811, at *2 (C.D. Cal. Apr. 29, 2014).  A trial court may rule on the issue of personal

10  jurisdiction by "relying on affidavits and discovery materials without holding an evidentiary

11  hearing," though "dismissal is appropriate only if the plaintiff has not made a prima facie showing

12  of personal jurisdiction."  *Fields v. Sedgwick Assoc. Risks, Ltd.*, 796 F.2d 299, 301 (9th Cir.1986).

13  In other words, in such cases, "we only inquire into whether [the plaintiff's] pleadings and

14  affidavits make a prima facie showing of personal jurisdiction."  *Caruth v. Int'l Psychoanalytical*

15  *Ass'n*, 59 F.3d 126, 128 (9th Cir. 1995).  A prima facie showing means that "the plaintiff need

16  only demonstrate facts that if true would support jurisdiction over the defendant."  *Doe v. Unocal*

17  *Corp.*, 248 F.3d 915, 922 (9th Cir. 2001).  Moreover, "for the purpose of this demonstration, the

18  court resolves all disputed facts in favor of the plaintiff."  *Pebble Beach Co. v. Caddy*, 453 F.3d

19  1151, 1154 (9th Cir. 2006).

20        "Where, as here, no federal statute authorizes personal jurisdiction, the district court

21  applies the law of the state in which the court sits."  *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647

22  F.3d 1218, 1223 (9th Cir. 2011).  California's long-arm statute has the same due process

23  requirements as the federal long-arm statute.  *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d

24  797, 801 (9th Cir. 2004).  The Due Process Clause requires that nonresident defendants have

25  "minimum contact" with the forum state such that the exercise of personal jurisdiction "does not

26  offend traditional notions of fair play and substantial justice."  *Int'l Shoe Co. v. State of Wash.,*

27  *Office of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945).

28

United States District Court
Northern District of California

**B.      Legal Standard on a 12(b)(6) Motion to Dismiss**

A Rule 12(b)(6) motion challenges the sufficiency of a complaint as failing to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A facial plausibility standard is not a "probability requirement" but mandates "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (internal quotations and citations omitted).  For purposes of ruling on a Rule 12(b)(6) motion, the court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the non-moving party." *Manzarek v. St. Paul Fire & Mar. Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  "[D]ismissal may be based on either a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Johnson v. Riverside Healthcare Sys.*, 534 F.3d 1116, 1121 (9th Cir. 2008) (internal quotations and citations omitted); *see also Neitzke v. Williams*, 490 U.S. 319, 326 (1989) ("Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law").

Even under the liberal pleading standard of Federal Rule of Civil Procedure 8(a)(2), under which a party is only required to make "a short and plain statement of the claim showing that the pleader is entitled to relief," a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555.)  "[C]onclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004); *see also Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) ("[A]llegations in a complaint or counterclaim may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively.").  The court must be able to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663.  "Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 663-64.

If a Rule 12(b)(6) motion is granted, the "court should grant leave to amend even if no

United States District Court
Northern District of California

9

1    request to amend the pleading was made, unless it determines that the pleading could not possibly

2    be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en

3    banc) (internal quotation marks and citations omitted).

**DISCUSSION**

4

5    **A.      Extra-Pleading Materials**

6           As a preliminary matter, before the Court can address the substance of Defendants'

7    motions to dismiss, the Court must rule on the admissibility of the myriad extra-pleading materials

8    that have been submitted to the Court in support of, and in opposition to, Defendants' motions.

9    When adjudicating a motion to dismiss brought pursuant to Federal Rule of Civil Procedure

10   12(b)(2), a court may consider extrinsic evidence—that is, materials outside of the pleadings,

11   including affidavits submitted by the parties. *Unocal Corp.*, 248 F.3d at 922; *Schwarzenegger v.*

12   *Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004).  When adjudicating a motion to

13   dismiss brought pursuant to Rule 12(b)(6), however, the Court's consideration of extra-pleading

14   materials is more limited.  Normally, the Court cannot consider matters outside of the pleading

15   without converting the motion into a motion for summary judgment.  *See* Fed. R. Civ. P. 12(b)(6);

16   12(d).  However, the Ninth Circuit has determined that courts may consider documents alleged in

17   a complaint and essential to a plaintiff's claims.  *See Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir.

18   1994); *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295 (9th Cir. 1998).  A court may also

19   "take judicial notice of documents on which allegations in the complaint *necessarily* rely, even if

20   not expressly referenced in the complaint, provided that the authenticity of those documents is not

21   in dispute." *Tercica, Inc. v. Insmed Inc.*, No. C 05-5027 SBA, 2006 WL 1626930, at *8 (N.D.

22   Cal. June 9, 2006) (citing *In re Autodesk, Inc. Sec. Litig.*, 132 F. Supp. 2d 833, 837-38 (N.D. Cal.

23   2000)).  In addition, a court may take judicial notice of matters of public record.  *Coto Settlement*

24   *v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010).

25          When a defendant files a motion on 12(b)(2) and 12(b)(6) grounds, the court may consider

26   extra-pleading material when determining whether it has personal jurisdiction over defendants but

27   exclude the same evidence from consideration of whether the complaint states a claim, even when

28   the two questions turn on the same issue. *See, e.g.*, *High v. Choice Mfg. Co.*, No. C-11-5478-

United States District Court
Northern District of California

EMC, 2012 WL 3025922, at *4-6 (N.D. Cal. July 24, 2012) (where both personal jurisdiction and the sufficiency of the complaint both turned on the question of alter ego, considering extra-pleading evidence with respect to the 12(b)(2) challenge but excluding the extra-pleading evidence from the 12(b)(6) analysis); *see also, e.g.*, *Abosakem v. Royal Indian Raj Int'l Corp.*, No. C-10-01781 MMC, 2011 WL 635222, at *10 n.7 (N.D. Cal. Feb. 11, 2011) (considering a declaration in the context of determining personal jurisdiction but not to determine the sufficiency of the complaint); *Righthaven, LLC v. Va. Citizens Def. League, Inc.*, No. 1:10-cv-01783-GMN, 2011 WL 2550627, at *6 & n.1 (D. Nev. June 23, 2011) (same).

In support of both the 12(b)(2) and 12(b)(6) motions, Defendants have submitted several affidavits with attached exhibits. Plaintiff objects to the Court's consideration of much of this evidence in the context of Defendants' 12(b)(6) motion. (*See* Dkt. No. 21 at 11; Dkt. No. 37 at 3.) Plaintiff has also submitted extra-pleading materials, though she offers separate materials in support of each motion.

Defendants urge that because their 12(b)(2) and 12(b)(6) motions are essentially predicated on the same foundation—*i.e.*, Plaintiff's allegation that Defendants and their foreign affiliated sub-publishers are all alter egos of each other and form a single enterprise—the Court should consider the evidence with respect to both motions. (*Id.* at 2.) At oral argument, however, Defendants appeared to concede that certain materials were only appropriate for consideration in the context of the 12(b)(2) motion and not the 12(b)(6) motion.

Given the early stage of this litigation, the Court declines to convert Defendants' 12(b)(6) motion to a motion for summary judgment. In the context of deciding EMI and EMI North America's 12(b)(2) motion to dismiss for lack of personal jurisdiction, the Court will consider all of the testimonial and documentary evidence that the parties submitted. *See Schwarzenegger*, 374 F.3d at 800. However, the Court will exclude the vast majority of these affidavits and documents from consideration on Defendants' 12(b)(6) challenge with the exception of certain documents that are referenced in or relied on in the complaint or central to Plaintiff's claims. *See Steckman*, 143 F.3d at 1295; *In re Autodesk*, 132 F. Supp. 2d at 837-38. Specifically, in determining the sufficiency of the complaint, the Court will consider only the following documents that

United States District Court
Northern District of California

1   Defendants submitted:  Exhibit A to the Foley Affidavit, Plaintiff's FAC itself (Dkt. No. 10-1);

2   Exhibits B through G to the Foley Affidavits and Exhibit B to the Foley Reply Affidavit, all

3   excerpts of royalty reports (Dkt. Nos. 10-2 through 10-7, 33-1); and Exhibit H to the Ashby

4   Affidavit, the Agreement (Dkt. No. 11-1).  These documents are all referenced in the complaint

5   and central to Plaintiff's claims: every claim turns on interpretation of the Agreement, and

6   Plaintiff repeatedly alleges that Defendants concealed their wrongful conduct through misleading

7   royalty statements.  (*See, e.g.*, Dkt. No. 1-1 ¶¶ 54, 61, 70.)  For the same reason, the Court will

8   also consider the royalty statements that Plaintiff submitted in her opposition to Defendants'

9   12(b)(6) motion (Dkt. No. 21-2).  Finally, the Court takes judicial notice of the *John v. James* case

10  attached as Exhibit A to the Carlin Declaration.  *See U.S. ex rel. Robinson Rancheria Citizens*

11  *Council v. Borneo*, 971 F. 2d 244, 248 (9th Cir. 1992) (noting that courts may "take notice of

12  proceedings in other courts, both within and without the federal judicial system, if those

13  proceedings have a direct relation to the matters at issue."); *see also Gabbanelli Accordions &*

14  *Imports, L.L.C. v. Gabbanelli*, 575 F.3d 693 (7th Cir. 2009) (considering a foreign judgment

15  without taking judicial notice); *Giaguara S.p.A. v. Amiglio*, 257 F. Supp. 2d 529, 533 (E.D.N.Y.

16  2003) (considering foreign court decisions without taking judicial notice).  The Court excludes all

17  remaining documents and affidavits from consideration on Defendants' 12(b)(6) motion.

18       Taking this approach—*i.e.*, considering the materials for the purposes of the 12(b)(2)

19  motion but excluding the very same materials from the 12(b)(6) context—is particularly apt given

20  that the alter ego analysis is slightly different in each context.  As will be explained in further

21  detail below, the question in the 12(b)(2) context is whether failing to treat all Defendants as a

22  single entity would unfairly leave her without recourse to challenge Defendants' billing practices

23  whereas, in the 12(b)(6) context, the question is whether Defendants have acted as a single entity

24  such that their conduct violates the Agreement.  Moreover, the 12(b)(2) analysis explores the

25  relationship between Screen Gems-EMI, EMI, and EMI North America, while the 12(b)(6)

26  analysis explores the relationship between Screen Gems-EMI and its foreign affiliated sub-

27  publishers.  With this preliminary matter addressed, the Court turns to Defendants' motions.

28

**B.**     **Motion to Dismiss for Lack of Personal Jurisdiction**

The Court will address the jurisdictional challenge first, since if there is no jurisdiction over a defendant, the Court need not consider whether the complaint states a claim against that defendant.

Defendants concede that the Court has personal jurisdiction over Screen Gems-EMI. Indeed, Screen Gems-EMI (or more precisely, its predecessor-in-interest), was party to the Agreement, which was signed in California, and has been sending Plaintiff royalty statements and directing money into Plaintiff's California-based bank account for the decades since the 1967 Agreement was executed. *See, e.g.*, *Plaspro GMBH v. Gens*, No. C 09-04302 RS, 2010 WL 2991675, at *5 (N.D. Cal. July 28, 2010) (finding personal jurisdiction based on defendants' negotiating and executing a contract in the forum state). Thus, only Defendants EMI and EMI North America challenge the Court's exercise of jurisdiction, arguing that the FAC does not allege "a single act by either EMI [ ] or EMI [North America] that connects them to [Plaintiff], this case[,] or even to California." (Dkt. No. 12 at 9.) Nevertheless, Plaintiff contends that the Court should impute Screen Gems-EMI's contacts to EMI and EMI North America under an alter ego or agency theory in order to find jurisdiction and that, in any event, the Court has specific jurisdiction over EMI North America based on that entity's contacts with this state. (*See* Dkt. No. 22 at 22-23.) The Court concludes that there is no basis for an exercise of personal jurisdiction over EMI and EMI North America: it is not appropriate to impute Screen Gems-EMI's contacts with California to the entities under an alter ego or agency theory, nor does EMI North America itself have sufficient contacts with the state to give rise to specific jurisdiction.

1.     <u>General Jurisdiction by Alter Ego or Agency Theory</u>

Plaintiff first argues that the Court has jurisdiction over EMI (a resident of the United Kingdom) and EMI North America (a citizen of Delaware) by imputing Screen Gems-EMI's contacts to those entities.[4] Courts have found in certain contexts that when one business entity is

---

[4] It is unclear whether the parties' position is that the Court has general or specific jurisdiction over Screen Gems-EMI, but based on Plaintiff's reference to Screen Gems-EMI's "continuous and systematic business contacts" with California, it appears that Plaintiff contends Screen Gems-EMI is subject to the Court's general jurisdiction. (*See* Dkt. No. 22 at 12.) *See Helicopteros*

the alter ego or is part of a single enterprise with another entity, the entity's contacts in the forum should be imputed onto the affiliated entities. *See Harris v. Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1134 (9th Cir. 2003) ("[A] subsidiary's contacts may be imputed to the parent where the subsidiary is the parent's alter ego, or where the subsidiary acts as the general agent of the parent[.]"); *Myhre v. Seventh-Day Adventist Church*, 298 F.R.D. 633, 644-45 (S.D. Cal. 2014) ("Alter egos are treated as a single entity for purposes of personal jurisdiction"). Imputing contacts under the alter ego theory has been found to be appropriate where the agency or alter ego relationship exists among sister companies that are alter egos of each other and operate as part of a single enterprise. *Oncology Therapeutics Network Connection v. Va. Hematology Oncology*, No. C 05-3033 WDB, 2006 WL 334532, at *15 (N.D. Cal. Feb. 10, 2006); *Hasso v. Hapke*, 227 Cal. App. 4th 107, 155 (2014).

Generally, the existence of a parent-subsidiary or mere sister-sister entity relationship "is not sufficient to establish personal jurisdiction over the parent on the basis of the subsidiaries' minimum contacts with the forum." *Unocal Corp.*, 248 F.3d at 925. However, "if the parent and subsidiary are not really separate entities [*i.e.*, alter egos], or one acts as an agent of the other, the local subsidiary's contacts with the forum may be imputed to the foreign parent corporation." *Id.* at 926 (quotations omitted). To satisfy the alter ego exception to the general rule, "the plaintiff must make out a prima facie case (1) that there is such unity of interest and ownership that the separate personalities [of the two entities] no longer exist and (2) that failure to disregard [their separate identities] would result in fraud or injustice." *Id.* (internal quotation marks omitted). The agency exception applies where "the subsidiary functions as the parent corporation's representative in that it performs services that are sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services." *Id.* at 928 (internal quotation marks omitted).

---

*Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984) (noting that for general jurisdiction to exist over a non-resident defendant, the defendant must engaged in "continuous and systematic general business conduct"); *Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000) (for general jurisdiction, a foreign defendant's business contacts in the forum state must be so continuous and systematic that they "approximate physical presence" in the state).

United States District Court
Northern District of California

United States District Court
Northern District of California

1     a.     *Alter Ego Theory*

2          When assessing whether there is unity of interest for the purposes of alter ego liability

3    courts consider "the commingling of funds and other assets of the entities, the holding out by one

4    entity that it is liable for the debts of the other, identical equitable ownership of the entities, use of

5    the same offices and employees, use of one as a mere shell or conduit for the affairs of the other,

6    inadequate capitalization, disregard of corporate formalities, lack of segregation of corporate

7    records, and identical directors and officers." *Sandoval v. Ali*, 34 F. Supp. 3d 1031, 1040 (N.D.

8    Cal. 2014) (citation omitted).

9                              i.     Unity of Interest Factors

10          The first unity of interest factor is whether the entities have commingled their assets.

11   Courts find that a plaintiff has sufficiently demonstrated commingling where the evidence shows

12   that the related companies transfer assets among themselves for no ascertainable reason. *See, e.g.*,

13   *Bank of Montreal v. SK Foods, LLC*, No. 5:11-mc-80133-EJD, 476 B.R. 588, 599 (N.D. Cal.

14   2012). The FAC alleges that Defendants "arbitrarily allocate funds between and among

15   themselves[,]" (Dkt. No. 1-1 ¶ 32), which Plaintiff contends is further supported by her bank

16   statements: the statements reflect that her royalty payments are paid not by Screen Gems-EMI,

17   but rather from yet another EMI entity, EMI Entertainment World, Inc. (Dkt. No. 21-2 ¶ 3 & Ex.

18   A). Plaintiff's counsel avers that EMI Entertainment World, Inc. is a Delaware corporation that

19   shares the same address as Screen Gems-EMI and EMI North America. (Dkt. No. 22-1 at Ex. H.)

20          Defendants dispute that the bank statements suggest comingling, and, to that end, have

21   submitted evidence that all related EMI companies use a central bank account—that of EMI

22   Entertainment World, Inc.—rather than using their own separate accounts. (Dkt. No. 32 ¶ 8; Dkt.

23   No. 34 ¶¶ 4-6.) EMI Entertainment World maintains records to ensure that each EMI entity is

24   charged a certain amount for the services it incurs and that each entity is liable only for the

25   payments it is contractually obligated to pay. (Dkt. No. 34 ¶ 5.) Based on the current record, then,

26   this factor weighs against a finding a unity of interest.

27          Under the second factor, courts consider evidence that one entity is holding itself out as

28   responsible for the debts of the other entities. Plaintiff does not argue that any of the Defendants

held themselves out as responsible for the debts of the others, so this factor weighs against a finding of alter ego liability.

The third factor is identical equitable ownership.  The parties agree that the ultimate owners of all companies under the EMI Music Publishing umbrella, including Screen Gems-EMI, EMI, and EMI North America, are the same: the consortium of investors including SONY/ATV. (*See* Dkt. No. 31 at 12.)  Thus, this factor weighs in favor of an alter ego finding with respect to both EMI and EMI North America.

The fourth factor pertains to whether the entities use the same offices and employees. Screen Gems-EMI and EMI North America share the same office in New York.  (Dkt. No. 13 ¶ 1.) In addition, common employees of SONY/ATV—the entity responsible for providing administrative services for all EMI companies in the United States—provide administrative services for both Screen Gems-EMI and EMI North America.  (Dkt. No. 11 ¶ 1; Dkt. No. 34 ¶ 6.) By contrast, EMI shares neither common offices nor common employees with the U.S.-based Defendants.  (*See* Dkt. No. 32 ¶¶ 8, 10-11.)  This factor weighs in favor of an alter ego determination with respect to EMI North America, but not with respect to EMI.

Under the fifth factor, courts must assess whether one entity is merely the shell or conduit for the other.  Plaintiff does not advance any particular evidence in support of this factor.  Rather, she contends that the other factors support an inference that Defendants were using each other as mere shells or conduits.  Because there is no particular evidence in support of this factor, it weighs against an alter ego determination.

The next factor considers whether the entity from which Plaintiff seeks to recover is inadequately capitalized.  Plaintiff does not argue that Screen Gems-EMI is inadequately capitalized.  To the contrary, Defendants note that Screen Gems-EMI is well-capitalized given that it owns a large catalogue of copyrights that generate millions of dollars annually, and that Screen Gems-EMI has been able to pay Plaintiff millions of dollars over the years.  (Dkt. No. 33 ¶¶ 29-30; Dkt. No. 34 ¶ 3.)  This factor thus weighs against a finding of alter ego liability.

Plaintiff does not discuss the seventh factor—disregard of corporate formalities—other than by referencing the common royalty payments, which are more appropriately addressed below.

United States District Court
Northern District of California

16

United States District Court
Northern District of California

1    (*See* Dkt. No. 22 at 16.)  Thus, this factor weighs against a finding of alter ego liability.

2        The eighth factor considers whether the entities fail to segregate their corporate records.

3    Plaintiff relies upon the fact that single umbrella entities are responsible for banking and

4    administrative services for all EMI entities, including Defendants in this matter.  (*See* Dkt. No. 22

5    at 17; Dkt. No. 1-1 ¶ 33.)  Indeed, the evidence indicating that the same individuals are responsible

6    for corporate records of all United States EMI entities, suggests that the records are kept all

7    together.  (*See* Dkt. No. 11 ¶ 1.)  Plaintiff also refers to the EMI entities' joint bank account,

8    suggesting that the shared account reflects a lack of segregation of bank records.  However, this

9    fact is explained in the Crimmins Affidavit, which notes that EMI Entertainment, Inc., which

10   maintains the account, also maintains separate records for each EMI entity.  (*See* Dkt. No. 34 ¶¶ 4-

11   6.)  Thus, this factor does not weigh for or against an alter ego determination.

12       The next factor considers whether the entities have identical officers and directors.  The

13   evidence indicates that Johnson is the President, CEO, and Secretary of Screen Gems-EMI and

14   EMI North America, as well as a director of EMI.  Frank Crimmins is the CFO of Screen Gems-

15   EMI, and the sole director of EMI North America and one of two EMI directors (the other being

16   Johnson).  Thus, the same two people are officers and directors of all three corporations.  (Dkt.

17   No. 13 ¶ 1; Dkt. No. 22-1 ¶¶ 4-6 & Ex. B-D.)  Nonetheless, it is well-settled that common

18   ownership is not dispositive.  *See Square 1 Bank v. Lo*, No. 12-CV-05595-JSC, 2014 WL

19   4181907, at *2 (N.D. Cal. Aug. 22, 2014); *Sandoval*, 34 F. Supp. 3d at 1040 ("Common

20   ownership alone is insufficient to disregard the corporate form.").  Moreover, in the absence of

21   evidence of actual control, courts generally presume that directors can and do "change hats" to

22   represent each corporation separately, despite their overlapping obligations as officers or directors

23   for more than one entity.  *United States v. Bestfoods*, 523 U.S. 51, 69 (1998); *Allphin v. Peter K.*

24   *Fitness, LLC*, No. 13-cv-1338-BLF, 2014 WL 6997653, at *5 (N.D. Cal. Dec. 11, 2014) (citation

25   omitted).  However, common ownership coupled with other factors, in particular, control, does

26   weigh in favor of an alter ego analysis, even if ever so slightly.

27       Here, three factors weigh in favor of finding a unity of interest among the EMI entities:

28   equitable ownership, use of the same offices and employees (for EMI North America only), and

1  identical officers and directors.  These factors, even when considered together, are not sufficient to

2  support a finding of unity of interest among these entities.

3                              ii.        Inequitable Result

4              Even if Plaintiff had met its prima facie burden, however, she has not established that an

5  inequitable, fraudulent, or unjust result will follow if either EMI or EMI North America does not

6  appear in this matter.  *See Unocal Corp.*, 248 F.3d at 926.  Defendant responds that there can be

7  no inequitable result where, as here, "the defendant with which [Plaintiff] has privity—[Screen

8  Gems]-EMI—" is already before the Court and "has the contractual obligation and financial

9  capacity to fully respond to her claims."  (Dkt. No. 31 at 15.)  In short, no inequitable result will

10  follow if neither EMI North America nor EMI is required to answer as a defendant in this lawsuit,

11  so the Court will not assert impute Screen Gems-EMI's contacts to either defendant on the basis of

12  alter ego liability.

13              Plaintiff's insistence that the inequitable result of failing to assert personal jurisdiction over

14  EMI and EMI North America is the potential for the continued unfair billing conduct alleged in

15  the complaint misses the mark.  Assuming for the purposes of this argument that Screen Gems-

16  EMI's billing conduct is, in fact, improper—even if EMI and EMI North America do not appear in

17  this matter, Screen Gems-EMI—the party to the Agreement—is properly before the Court to

18  answer Plaintiff's claim and satisfy any potential judgment.

19                         b.        *Agency Theory*

20              Nor has Plaintiff made a prima facie showing that Screen Gems-EMI is the agent of EMI

21  or EMI North America for the purposes of asserting personal jurisdiction over either entity.  "The

22  agency test permits the imputation of contacts where [one entity] was either established for, or is

23  engaged in, activities that, but for the existence of [the first entity, the second entity] would have

24  to undertake itself."  *Harris*, 328 F.3d at 1134-35 (citation omitted).  While the agency

25  relationship is more often applied to parent and subsidiary entities, the Ninth Circuit has noted that

26  "[t]here appears to be no reason why a completely independent, in-state corporation cannot be

27  held to have acted as an agent for another, out-of-state corporation[.]"  *Wells Fargo & Co. v. Wells*

28  *Fargo Exp. Co.*, 556 F.2d 406, 419 (9th Cir. 1977).  To establish jurisdiction based on an agency

theory, a plaintiff must first show that Screen Gems-EMI "performs services that are sufficiently important to the [EMI and EMI North America] that if [EMI and EMI North America] did not have a representative to perform them, [EMI and EMI North America]'s own officials would undertake to perform substantially similar services." *United States v. Pangang Grp. Co.*, 879 F. Supp. 2d 1052, 1058 (N.D. Cal. 2012) (citing *Bauman v. DaimlerChrysler Corp.*, 644 F.3d 909, 920-21 (9th Cir. 2011), *rev'd on other grounds by Daimler AG v. Bauman*, 132 S. Ct. 746 (2014)). Second, Plaintiff must demonstrate that Screen Gems-EMI "exercises a measure of control over" EMI and EMI North America. *Pangang Grp. Co.*, 879 F. Supp. 2d at 1059.

Here, Plaintiff argues that Screen Gems-EMI 's contacts should be imputed to EMI North America and EMI because the FAC alleges that each Defendant acts as "the agent" of the others. (Dkt. No. 1-1 ¶ 13.)  This broad and conclusory allegation falls far short of the showing needed to meet both prongs of the agency test.  Indeed, Plaintiff has nowhere alleged that but for the existence of Screen Gems-EMI, EMI and EMI North America would have performed the activities in entering a copyright contract with Plaintiff, hiring foreign sub-publishers, and paying Plaintiff. Under the circumstances presented, Plaintiff has not made a sufficient showing that Screen Gems-EMI is the agent of either EMI or EMI North America.  Thus, the Court cannot exercise personal jurisdiction over EMI North America or EMI by imputing Screen Gems-EMI's contacts to it under an agency theory.

2. <u>Specific Jurisdiction Directly Over EMI North America Based on Minimum Contacts</u>

In the alternative, Plaintiff argues that EMI North America itself—though not EMI—has sufficient "minimum contacts" with California such that the Court may assert specific jurisdiction. (Dkt. No. 22 at 20.)[5]  The Ninth Circuit employs a three-prong test ("Minimum Contact Test") to

---

[5] Plaintiff appears to argue that the Court has specific jurisdiction only over EMI North America, although elsewhere in her briefing Plaintiff identifies certain examples of EMI's business contacts with California.  Specifically, Plaintiff points to EMI's registered trademark in "IT'S POP IT'S ART" used for events in California (Dkt. No. 22-1 ¶ 7 & Ex. E), and possible participation in EMI Music Publishing's acceptance of a "Music Publisher of the Year" award, as no specific EMI entity was identified (*id.* ¶ 3 & Ex. A).  The Court need not consider these contacts in the context of determining whether to assert specific personal jurisdiction over EMI, because the claims in this lawsuit plainly do not arise out of either of these activities.  *See Yahoo! Inc. v. La Ligue Contre Le*

United States District Court
Northern District of California

determine whether a party has sufficient minimum contacts to be susceptible to specific jurisdiction:

> 1)  The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> 2)  the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> 3)  the exercise of jurisdiction must comport with fair play and substantial justice, i.e., it must be reasonable.

*Yahoo! Inc. v. La Ligue Contre Le Racisme*, 433 F.3d 1199, 1205-06 (9th Cir. 2006); *Schwarzenegger*, 374 F.3d at 802; *Data Disc., Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1288 (9th Cir. 1977).  The plaintiff bears the burden of satisfying the first two prongs of this test. *Schwarzenegger*, 374 F.3d at 802.  If the plaintiff satisfies this burden, the burden shifts to the defendant to make a 'compelling case' that the third prong—the exercise of jurisdiction is reasonable—is not met.  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476-78 (1985).  "If any of the three requirements is not satisfied, jurisdiction in the forum would deprive the defendant of due process of law."  *Pebble Beach Co.*, 453 F.3d at 1155 (internal quotation marks and citation omitted).

The first prong of the minimum contact test "ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or a third person."  *Burger King*, 471 U.S. at 475 (internal quotation marks and citation omitted).  Under this prong, courts generally use the purposeful availment analysis in suits, such as this, sounding in contract, whereas the purposeful direction analysis is more often used for suits sounding in tort.  *Schwarzenegger*, 374 F.3d at 802 (citation omitted).  To establish purposeful availment, the plaintiff must show that the "defendant has taken deliberate action within the forum state or [ ] has created continuing obligations to forum residents."  *Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995).  Thus, the Court must decide whether Plaintiff has

*Racisme*, 433 F.3d 1199, 1205-06 (9th Cir. 2006).

1    established a prima facie case that EMI North America has taken deliberate action in California or

2    created continuing obligations to a California resident.  She has not done so.

3            Plaintiff highlights the royalty statements that Plaintiff received from 2009 through 2012,

4    all of which contain the following footer at the bottom of each page:  "EMI MUSIC

5    PUBLISHING NORTH AMERICA, 75 NINTH AVENUE, 4TH FLOOR, NEW YORK, NY

6    1001 Tel. (212) 492-1716 E-mail: usa.royaltydept@emimusicpub.com."  (*See, e.g.*, Dkt. No. 21-2

7    at 5-7.)  From this evidence Plaintiff argues that EMI North America "created a continuing

8    obligation to Plaintiff, which by definition it knew to be a California resident, by not only

9    providing Plaintiff with notifications pertaining to the royalty statements, thereby performing the

10   Contract in California, but by inviting Plaintiff to contact it by providing its address, phone

11   number, and email on every page of the statements."  (Dkt. No. 22 at 21.)

12           Turning to the second prong, Plaintiff's alleged harm arises out of the royalty statements:

13   Plaintiff alleges that "Defendants" concealed the alleged wrongdoing in the royalty statements

14   insofar as the statements did not clearly expose the payment scheme, and thus, absent these

15   misleading statements Plaintiff would not have suffered harm for as many years because she

16   would have discovered the alleged wrongdoing.  (*See, e.g.*, Dkt. No. 1-1 ¶¶ 40, 70.)  Thus,

17   Plaintiff contends, this action arises directly out of EMI North America's action of directing

18   royalty statements to Plaintiff in California.

19           The difficulty with this argument is that Defendants offer evidence the "EMI MUSIC

20   PUBLISHING NORTH AMERICA" in the royalty statement footer is not the

21   "EMI Music Publishing Group North America, Inc." sued in this action.  (Dkt. No. 31 at 7.)

22   Instead, "EMI MUSIC PUBLISHING NORTH AMERICA" "is simply a geographic designation,

23   for the United States music publishing business."  (Dkt. No. 33 ¶ 23.)  This statement is consistent

24   with some of the cover letters which accompanied the royalty statements.  For example, the cover

25   letter dated March 1, 2010, on "EMI Music Publishing" letterhead, identifies the sender as

26   SCREEN GEMS/COLGEMS (the EMI entity indisputably a party to the contract) and is signed by

27   "EMI Music Publishing" "Vice President, Global Services, North American Operations."  (Dkt.

28   No. 33-1 at 1.)  In light of this evidence, the vague reference to "EMI MUSIC PUBLISHING

United States District Court
Northern District of California

21

United States District Court
Northern District of California

NORTH AMERICA" in and of itself is insufficient to create a factual conflict that must be resolved in Plaintiff's favor.  *See Pebble Beach Co.*, 453 F.3d at 1154.  There is simply no evidence that defendant EMI Music Publishing Group, North America, Inc. created a continuing obligation with Plaintiff, a California resident.  In *Ballard*, in contrast, the defendant had customers—that is, persons with whom the defendant had a continuing obligation—in the forum. 65 F.3d at 1498.  There are no grounds for the exercise specific jurisdiction over EMI North America.

       3.     <u>Jurisdictional Discovery</u>

      The district court has discretion to allow a plaintiff to conduct jurisdictional discovery. *Wells Fargo & Co. v. Wells Fargo Exp. Co.*, 556 F.2d 406, 430 n.24 (9th Cir. 1977).  Requests for such discovery should ordinarily be granted "where pertinent facts bearing on the question of jurisdiction are controverted . . . or where a more satisfactory showing of the facts is necessary." *Id.* (internal quotation marks and citation omitted).  However, a district court need not permit discovery "[w]here a plaintiff's claim of personal jurisdiction appears to be both attenuated and based on bare allegations in the face of specific denials made by the defendants[.]" *Pebble Beach,* 453 F.3d at 1160 (quotations omitted).  The Court declines to allow specific jurisdictional discovery.  The only jurisdictional theory which is potentially viable is the alter ego theory; however, even if through discovery Plaintiff could establish a unity of interest, there are no facts to be discovered to assist Plaintiff in establishing the inequitable result requirement because Screen Gems-EMI—a viable defendant—remains before the Court.

**B.**     **Motion to Dismiss for Failure to State a Claim**

      Screen Gems-EMI contends that each cause of action in the complaint fails to state a claim upon which relief may be granted.

       1.     <u>First Cause of Action:  Breach of Contract</u>

      Plaintiff's first cause of action alleges that Screen Gems-EMI's royalty payment practices with respect to both foreign and domestic revenue breaches the Agreement.  To state a claim for breach of contract under California law, a plaintiff must allege (1) the existence of a contract; (2) that she performed or that her performance is excused; (3) defendant breached the contract; and

(4) damages resulted from that breach. *See Troyk v. Farmers Grp., Inc.*, 171 Cal. App. 4th 1305, 1352 (2009).  Here, there is no dispute that the Agreement satisfies the first element, and that Plaintiff performed under the contract by giving Defendants ownership over Daydream Believer.  Rather, the last two elements are at issue here.  Defendants argue that Plaintiff's breach of contract claims fail for three main reasons:  first, because the plain language of the Agreement mandates that royalty payments be made in the very manner that the FAC describes; second, because courts have rejected Plaintiff's argument regarding a similar contract; and third, because the parties' decades-long course of performance establishes Plaintiff's consent to the payment structure she now challenges.  (Dkt. No. 9 at 16-21.)

> a.    *The FAC Sufficiently Alleges that Screen Gems-EMI and its Foreign Affiliated Sub-Publishers Are Part of a Single Enterprise*

In contrast to the alter ego determination in the 12(b)(2) context, which hinged on the relationship between Screen Gems-EMI, EMI, and EMI North America, the sufficiency of Plaintiff's claims turns on whether Plaintiff has alleged enough facts to set forth a plausible claim that Screen Gems-EMI and its foreign affiliated sub-publishers are part of a single enterprise.  "If that [allegation] is true, then the FAC states a claim for breach of contract against [Defendants] since the 'Publisher,' i.e., the single enterprise EMI Music Publishing, of which Screen Gems-EMI is one arm, is contractually obligated to pay Plaintiff 50% of 'any and all net sums actually earned and actually received' by it," which, based on the single enterprise allegation, includes sums that the foreign sub-publishers received, as well."  (Dkt. No. 21 at 14.)  Thus, the impropriety of Screen Gems-EMI's conduct—and therefore the sufficiency of the FAC—rises and falls on whether Plaintiff has adequately alleged that Defendants and their foreign affiliates are alter egos of each other and are operating as a single enterprise.

In determining whether a complaint has adequately pleaded alter ego liability, courts start from the premise that "[a]lter ego is a limited doctrine, invoked only where recognition of the corporate form would work an injustice[.]"  *Moreland v. Ad Optimizers, LLC*, No. C13-00216 PSG, 2013 WL 1410138, at *2 (N.D. Cal. Apr. 8, 2013) (citation omitted).  To invoke the alter

United States District Court
Northern District of California

ego doctrine, a plaintiff must allege facts sufficient to support a plausible claim that: (1) there is such a unity of interest and ownership that the separate personalities of the two corporations no longer exist; and (2) if the acts are treated as those of only one of the corporations, an inequitable result will follow. *In re Schwarzkopf*, 626 F.3d 1032, 1038 (9th Cir. 2010) (citation omitted); *Harris*, 328 F.3d at 1134.[6] As described above in the context of determining personal jurisdiction, in assessing whether there is a unity of interest, courts consider "the commingling of funds and other assets of the entities, the holding out by one entity that it is liable for the debts of the other, identical equitable ownership of the entities, use of the same offices and employees, use of one as a mere shell or conduit for the affairs of the other, inadequate capitalization, disregard of corporate formalities, lack of segregation of corporate records, and identical directors and officers." *Sandoval*, 34 F. Supp. 3d at 1040. "Common ownership alone is insufficient to disregard the corporate form." *Id.* Relevant here, the alter ego doctrine may apply between a parent and a subsidiary or, "under the single enterprise rule, . . . between sister or affiliated companies." *Wehlage v. EmpRes Healthcare, Inc.*, 791 F. Supp. 2d 774, 782 (N.D. Cal. 2011) (citing *Troyk*, 171 Cal. App. 4th at 1342).

Plaintiff cites pre-*Iqbal* and *Twombly* cases for the proposition that a plaintiff need only allege the *elements* of alter ego liability without supporting the allegations with facts. (Dkt. No. 21 at 15 (citing *Smith v. Simmons*, No. 1:05-CV-01187-OWW-GSA, 2008 WL 744709, at *11 (E.D. Cal. Mar. 18, 2008) (referencing "notice pleading" and contending that Plaintiff's allegations of alter ego liability even absent factual descriptions are sufficient under Rule 12(b)(6)).) After *Iqbal* and *Twombly*, however, a complaint must allege the elements of alter ego *along with* facts that support each element. *See High*, 2012 WL 3025922, at *4-6; *Square 1 Bank*, 2014 WL 4181907, at *2 ("[A] plaintiff must allege specifically both the elements of alter ego liability, *as well as facts supporting each* [element]." (citation omitted)); *Mindlab Media, LLC v.*

---

[6] The parties agree that California law applies to Plaintiff's alter ego claims, as it applies to Plaintiff's remaining common claims. *See Schwarzkopf*, 626 F.3d at 1037 (whether alter ego liability applies depends on "the law of the forum state); *see also Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002) (in diversity cases involving state law claims, federal courts apply the law of the forum state).

*LWRC Int'l LLC*, No. CV 11-3405 CAS (FEMX), 2012 WL 386695, at *4 (C.D. Cal. Feb. 6, 2012) (finding complaint failed to state a claim for alter ego where it contained only allegations that defendants acted as "the alter egos, agents, servants, and joint ventures [sic] of each other . . . with the knowledge . . . and approval of the other Defendants" to be "legal conclusions [ ] unsupported by any facts").[7]  Some courts have held that the complaint need only plead at least two factors in support of a unity of interest to satisfy this element.  *See Daewoo Elecs. Am., Inc. v. Opta Corp.*, No. C 13-1247 JSW, 2013 WL 3877596, at *5 (N.D. Cal. July 25, 2013) (citation omitted); *see also Pac. Mar. Freight, Inc.*, 2010 WL 3339432, at *6 ("The identification of the elements of alter-ego liability plus two or three factors has been held sufficient to defeat a 12(b)(6) motion to dismiss." (citation omitted)).

        With respect to the unity of interest element, Plaintiff points to allegations that Screen Gems-EMI and all EMI affiliates have all been doing business collectively as "EMI Music Publishing" (Dkt. No. 1-1 ¶ 11); that the foreign affiliates are all "wholly owned and/or controlled subsidiaries of EMI Music Publishing" (*id.* ¶ 25); that the foreign affiliates use the name "EMI Music Publishing" with the name of the territory appended (*id.*); and that EMI Music Publishing exercises total control over these subsidiaries (*id.* ¶ 26).  The FAC alleges further that Screen Gems-EMI and the sub-publishers commingle funds "by arbitrarily allocate[ing] funds between and among themselves and the affiliates[.]"  (*Id.* ¶ 32.)

        These allegations are sufficient to survive a 12(b)(6) motion.  The FAC alleges specific facts regarding the nature of the relationship among Defendants and their foreign affiliates that are pertinent to assessing alter ego:  they all use the same EMI name; the foreign affiliates are wholly owned and/or controlled subsidiaries of that entity; EMI exercises total control over the foreign affiliates; Screen Gems-EMI and the affiliated sub-publishers pass funds (specifically, fees for sub-publishing) between and among themselves—facts from which the Court could infer that

---

[7] Whether the heightened pleading requirements set forth in Federal Rule of Civil Procedure 9(b) "applies to pleadings of alter ego liability has been the subject of debate in district courts nationwide."  *Risinger v. SOC LLC*, 936 F. Supp. 2d 1235, 1242 n.2 (D. Nev. 2013) (collecting cases).  However, the Court need not resolve such debate here, as Defendants nowhere contend that Rule 9(b) applies.

United States District Court
Northern District of California

there is a disregard of corporate formalities, commingling of corporate funds, or failure to segregate records.  (*See* Dkt. No. 1-1 ¶¶ 11, 25-26, 32-33.)  Courts have found a unity of interest premised on even less.  *See, e.g.*, *Daewoo*, 2013 WL 3877596, at *2 (finding the plaintiff's allegations that defendant "was a mere instrumentality" and "directed and controlled [an affiliated entity's] dealings" sufficient to allege a unity of interest).

Screen Gems-EMI nevertheless urges the Court to reject the vast majority of these allegations in their entirety because they are alleged on "information and belief."  (Dkt. No. 30 at 14.)  Although conclusory allegations based solely on information and belief *may* be insufficient to state a claim for alter ego, *see, e.g.*, *Sandoval*, 34 F. Supp. 3d at 1040, this is far from a bright line rule.  In *Sandoval*, the plaintiff alleged on information and belief that the defendants were all alter egos of a single corporation, and that all individual defendants were "underfunded, are not stand alone corporations, have common management and pay practices, share labor and materials, including a distribution and billing system, and operate a common marketing system." *Id.* (record citation omitted).  The *Sandoval* court held that these allegations were too conclusory to state a claim.  *Id.*  Put another way, in *Sandoval* the court rejected the alter ego allegations not because they were alleged on information and belief, but rather because the information-and-belief allegations mimicked the language of the factors that courts used to determine alter ego and did not supply any specific facts.  *See id.*  Such is not the case here:  the FAC alleges—albeit, on information and belief—a particular relationship between Screen Gems-EMI and its foreign sub-publishers in terms of the extent of control, the existence of a single enterprise, and methods of passing funds among the entities.  Thus, the information-and-belief allegations in the FAC are sufficient to state a plausible claim that Screen Gems-EMI and its foreign affiliates have a unity of interest.

To establish inequity in the absence of alter ego liability, a plaintiff must plead facts sufficient to demonstrate that "conduct amounting to bad faith makes it inequitable for the corporate owner to hide behind the corporate form." *Sonora Diamond Corp. v. Sup. Ct.*, 83 Cal. App. 4th 523, 539 (2000).  Here, Plaintiff has certainly highlighted potentially inequitable conduct on Defendants' part:  namely, if Screen Gems-EMI and the foreign sub-publishers are actually part

26

of a single enterprise such that the sub-publisher's revenue is Screen Gems-EMI's revenue, the practice is significantly and unfairly reducing the amount of royalties to which Plaintiff is entitled under the Agreement and is unjustly enriching Defendants.  (*See, e.g.*, Dkt. No. 1-1 ¶¶ 28-30.)  Although the logic is somewhat circular, it suffices at this stage of the litigation where the Court must accept the factual allegations as true.  *See Manzarek*, 519 F.3d at 1031.

Accordingly, the Court concludes that Plaintiff has alleged sufficient facts to state a plausible claim that Screen Gems-EMI and the foreign sub-publishers were part of a single enterprise such that Screen Gems-EMI breached the Agreement by withholding foreign revenue from Plaintiff that Screen-Gems-EMI paid to those affiliates.

b.     *Screen Gems-EMI's Cases do not Require Dismissal*

Screen Gems-EMI insists that Plaintiff's contract claim must fail because numerous courts have rejected the same arguments she now advances.  (Dkt. No. 9 at 17 ("An unbroken line of decisional authority bars Plaintiff's claims.").)  It cites a number of courts that have addressed "net receipt" publisher agreements and have found that publishers can work with affiliated foreign sub-publishers without breaching the contracts.  *See Ellington v. EMI Music, Inc.*, 24 N.Y.3d 239, 243-44 (2014); *Jobim v. Songs of Universal, Inc.*, 732 F. Supp. 2d 407, 416-17 (S.D.N.Y. 2010); *Berns v. EMI Music Publ'g, Inc.*, No. 95 Civ. 8130 (KTD), 1999 WL 1029711, at *7 (S.D.N.Y. Nov. 10, 1999).  But the cases that Screen Gems-EMI cites are distinguishable.

In *Ellington v. EMI Music, Inc.*, a New York state court reviewed a similar agreement regarding royalty payments between a songwriter and publisher.  24 N.Y.S.3d  239, 243-44.  The *Ellington* plaintiffs, as Plaintiff here, argued that EMI breached the agreement by subtracting the monies paid to foreign EMI affiliated sub-publishers in computing the net revenues from which the plaintiffs were paid their 50 percent royalty.  *Id.*  Unlike Plaintiff here, however, the *Ellington* plaintiffs did not argue that the EMI affiliated foreign sub-publishers were alter egos of EMI and part of a single enterprise; instead, they argued that the contract somehow barred EMI from deducting from receipts monies paid to affiliated companies.  The New York court disagreed, concluding that the unambiguous language of the contract does not prohibit EMI from deducting from gross receipts monies paid to affiliated foreign sub-publishers.  The result would be the same

27

1    here if that was Plaintiff's theory, but it is not.

2         Likewise, in *Jobim v. Songs of Universal, Inc.*, a New York federal district court addressed

3    a similar challenge to a foreign royalty provision in a songwriter agreement.  732 F. Supp. 2d at

4    416-17.  The contract provided, in relevant part, that the publisher must pay the songwriter 50

5    percent of "all monies earned for the licensed territory."  *Id.* at 416.  The plaintiffs argued that the

6    broad "all monies earned" contract supported an "at source" reading of the contract, rather than a

7    "net receipts" reading.  *Id.*  The court concluded that the term "all monies earned" was ambiguous,

8    so it considered other provisions in the contract as well as the parties' course of performance and

9    custom in the industry, and concluded that it was a "net receipts" agreement.  *Id.* at 416-17.  The

10   *Jobim* plaintiffs did not argue that any foreign sub-publisher was the alter ego of the publisher, nor

11   did the court reach that issue.

12        Screen Gem-EMI's reliance on *Berns v. EMI Music Publishing* fares no better.  In *Berns*,

13   the plaintiffs similarly brought suit challenging EMI's royalty payment practice.  1999 WL

14   1029711, at *1.  There were several contracts at issue in *Berns*, the first of which provided that the

15   songwriter was entitled to 50 "percent of all net earned sums received and actually retained by the

16   publisher."  Later agreements contained different language, stating that the songwriter would

17   receive 50 percent of the income received from his songs "at the sources"—*i.e.*, an "at source"

18   agreement.  *Id.* at *6.  The trial court granted the defendant's motion for summary judgment

19   because the plaintiffs conceded that the later agreements contained language explicitly stating that

20   it did not modify or supersede the earlier agreement.  *Id.*  at *6-7.  The *Berns* court did not address

21   how to treat foreign revenue received by affiliated sub-publishers that are alter egos of or part of a

22   single enterprise with the publisher.

23        Thus, none of the cases upon which Screen Gems-EMI relies involved allegations that the

24   foreign affiliated sub-publishers are the alter egos of the publisher that was a party to the contract.

25   *See Ellington*, 24 N.Y.3d at 244; *Berns*, 1999 WL 1029711, at *6-7; *Jobim*, 732 F. Supp. 2d at

26   416-17.   In short, Plaintiff here is waging a different attack on monies Screen Gems-EMI paid to

27   affiliated foreign sub-publishers.  While Plaintiff's particular challenge may ultimately suffer the

28   same fate as the previous challenges, those earlier cases do not mandate dismissal of Plaintiff's

United States District Court
Northern District of California

28

different theory.

c.     *The Parties' Course of Performance Does not Require Dismissal*

Screen Gems-EMI's last argument, that the parties' decades-long course of performance dooms Plaintiff's claim, fares no better.  Screen Gems-EMI argues that the parties' course of performance shows that Screen Gems-EMI has regularly disclosed its use of foreign affiliated sub-publishers and their retention of 50% of the income earned in their territory.  (Dkt. No. 9 at 20.) California law defines course of performance as:

> a sequence of conduct between the parties to a particular transaction that exists if (1) the agreement of the parties with respect to the transaction involves repeated occasions for performance by a party; and (2) the other party, with knowledge of the nature of the performance and opportunity for objection to it, accepts the performance or acquiesces in it without objection.

Cal. Comm. Code § 1303(a); *see also Emp'rs Reins Co. v. Sup. Ct.*, 161 Cal. App. 4th 906, 920-21 (2008).  The parties' course of performance, that is, the provision of the royalty statements, does not as a matter of law defeat Plaintiff's contract claim.

First, Plaintiff alleges that the royalty statements are unclear and that Plaintiff did not have knowledge of the nature of Screen Gems-EMI's performance nor opportunity to object to it until her accountant finally discovered it after decades of performance.  (Dkt. No. 1-1 ¶ 40; Dkt. No. 21 at 24.)  Having viewed the royalty reports itself, the Court does not find that they "plainly refute" Plaintiff's allegation that the statements were unclear.  Rather, accepting as true Plaintiff's allegation that she did not understand the royalty reports, as the Court must, the course of performance prior to Plaintiff's hiring an accountant reveals little about whether she acquiesced in Screen Gems-EMI's payment practices.

Second, and relatedly, even if the royalty statements clearly indicated that Screen Gems-EMI was not paying Plaintiff royalties on amounts paid to the affiliated foreign sub-publishers, they do not in and of themselves reveal the alleged relationship between Screen Gems-EMI and the foreign affiliated sub-publishers.  Thus, to the extent that—as Plaintiff alleges—they were in fact alter egos or part of a single enterprise, the course of performance does not defeat Plaintiff's claim at this stage.

United States District Court
Northern District of California

The same result holds true for Plaintiff's claims that Screen Gems-EMI breached the Agreement by deducting phony "collection agency fees" for royalties paid directly to Screen Gems-EMI by entities including SONY—*i.e.*, fees that were allegedly not collected by an agent at all.  (Dkt. No. 1-1 ¶ 39.)  Accordingly, the breach of contract claim may proceed against Screen Gems-EMI.

> 2.   Second Cause of Action:  Breach of the Implied Covenant of Good Faith and Fair Dealing

Plaintiff's second cause of action alleges that Screen Gems-EMI breached the implied covenant of good faith and fair dealing.  (Dkt. No. 1-1 ¶¶ 51-57.)  EMI gives short shrift to this claim, arguing that it is simply derivative or duplicative of Plaintiff's breach of contract claim and that it cannot stand when there is a contractual provision in place that allows for the specific conduct being challenged.

Every contract contains an implied-in-law covenant of good faith and fair dealing.  *Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 683-84, (1988).  "Simply stated, the burden imposed is that neither party will do anything which will injure the right of the other to receive the benefits of the agreement. Or, to put it another way, the implied covenant imposes upon each party the obligation to do everything that the contract presupposes they will do to accomplish its purpose." *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1393 (1990) (citations, quotations, and alterations omitted).  "The precise nature and extent of the duty imposed will depend on the contractual purposes." *Id.* (citation, quotation marks, and alterations omitted).  In addition, actions for breach of the implied covenant are generally limited to contract damages. *Foley*, 47 Cal.3d at 683-84 (holding that compensation for breach of the covenant of good faith and fair dealing, in all contexts outside of insurance contracts, "has almost always been limited to contract rather than tort remedies").

A breach of the implied covenant "does not require subjective bad faith or a breach of [a] contract's express terms." *Boland, Inc. v. Rolf C. Hagen (USA) Corp.*, 685 F. Supp. 2d 1094, 1103 (E.D. Cal. 2010); *see also Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 373 (1992) ("[B]reach of a specific provision of the contract is not a necessary

30

1    prerequisite." (citation omitted)).  However, a party cannot breach the implied covenant by

2    engaging in acts or conduct consistent with the express provisions of a contract.  *Carma*

3    *Developers*, 2 Cal. 4th at 373 (citations omitted).  "Difficulty arises in deciding whether such

4    conduct, though not prohibited, is nevertheless contrary to the contract's purposes and the parties'

5    legitimate expectations."  *Id*.

6           The Agreement provides that Plaintiff will receive 50 percent of the revenue actually

7    received by the Publisher from foreign publication.  Screen Gems-EMI has a duty to execute the

8    Agreement's purposes in good faith.  Plaintiff alleges that Screen Gems-EMI breached that duty

9    by paying fees to its affiliated foreign sub-publishers "at grossly higher than market rates for such

10   services[.]" (Dkt. No. 1-1 ¶ 54.)  Such alleged conduct plausibly violates the rule that neither party

11   to the contract "will do anything which will injure the right of the other to receive the benefits of

12   the agreement.  *Careau & Co*., 222 Cal. App. 3d at 1393 (internal quotation marks and citation

13   omitted).

14          Screen Gems-EMI nonetheless argues that such a claim is superfluous of Plaintiff's breach

15   of contract claim and therefore must be dismissed.  (Dkt. No. 9 at 22.)  To be sure, California

16   courts have held that "where breach of an actual term [of a contract] is alleged, a separate implied

17   covenant claim, based on the same breach, is superfluous."  *Guz v. Bechtel Nat'l Inc.*, 24 Cal. 4th

18   317, 327 (2000).  But "the plain language of the court's holding in *Guz* leaves open the possibility

19   that a claim for breach of the implied covenant can survive while a plaintiff makes a claim for

20   breach of contract" where the implied covenant claim "is based on a different breach than the

21   contract claim."  *Daly v. United Healthcare Ins. Co.*, No. 10-CV-03032-LHK, 2010 WL 4510911,

22   at *4 (N.D. Cal. Nov. 1, 2010) (citations omitted); *Roberson v. Quest Diagnostics, Inc.*, No. 07-

23   2140-JAM-JFM, 2009 WL 4715859, at *6 (E.D. Cal. Dec. 2, 2009) (recognizing this exception

24   but finding it inapplicable); *Fin. Tech. Partners L.P. v. FNX Ltd.*, No. C-07-01298 JSW, 2009 WL

25   3809604, at *2 (N.D. Cal. Nov. 13, 2009) (same); *Lamke v. Sunstate Equip. Co.*, 387 F. Supp. 2d

26   1044, 1048 (N.D. Cal. 2004) (same).  In other words, "[i]f a party can breach the covenant without

27   breaching an express provision of the contract, a plaintiff can presumably claim a breach of the

28   covenant that is based on a different breach than a concurrently alleged contract claim."  *Daly*,

United States District Court
Northern District of California

31

1  2010 WL 4510911, at *4.

2      Here, Plaintiff's claim for breach of the implied covenant of good faith and fair dealing is

3  distinguishable from her breach of contract claim and consistent with the terms of the Agreement,

4  and thus not superfluous.  *See id.*, at *7.  Specifically, while Plaintiff's contract claim specifically

5  arises out of violations of the 50 percent net receipts royalty payment provisions, the implied

6  covenant claim asserts that Screen Gems-EMI has wronged Plaintiff by paying fees to foreign sub-

7  publishers that are grossly above market rate, thereby depriving Plaintiff of the full benefit of the

8  50% net receipts royalty.  (Dkt. No. 1-1 ¶ 54.)  The Agreement does not contain any provisions

9  that address the fees charged by sub-publishers (*see id.* at Ex. A); rather, the claim arises solely out

10 of the implied covenant.  To put it another way, Plaintiff's claim is that even if the affiliated

11 foreign sub-publishers are not factually and legally part of a single enterprise with Screen Gems-

12 EMI, the grossly high (according to Plaintiff) fees Screen Gems-EMI agreed to pay the affiliated

13 sub-publishers violate the implied covenant.  Thus, Plaintiff's breach of the implied covenant of

14 good faith and fair dealing claim is not necessarily duplicative of the breach of contract claim.

15     Screen Gems-EMI's reliance on *Bionghi v. Metropolitan Water District of Southern*

16 *California*, 70 Cal. App. 4th 1358 (1999), is unpersuasive.  There the court held the implied claim

17 was duplicative of the breach of contract claim because it relied on the same acts and sought the

18 same damages as the contract claim.  *Id.* at 1370.  Here, the acts constituting the breach of contract

19 differ (although there is overlap) from the acts constituting the breach of the implied covenant:  the

20 breach of contract claim disputes the netting out of *any* of the fees paid to affiliated foreign sub-

21 publishers on the grounds that the sub-publishers and Screen Gems-EMI must be treated as a

22 single "Publisher" within the meaning of the Agreement, whereas the acts constituting the breach

23 of the implied covenant are paying grossly high fees to the foreign sub-publishers.  The damages

24 therefore also differ.  Under the breach of contract claim Plaintiff would be entitled to 50% of the

25 fees paid to the affiliated sub-publishers; under the implied covenant claim Plaintiff's damages

26 would be 50% of the difference between the fees paid and the fees that should have been paid.

27 The implied covenant claim therefore survives.

28

United States District Court
Northern District of California

32

United States District Court
Northern District of California

3.     Third Cause of Action:  Violations of the Unfair Competition Law

Plaintiff's third cause of action alleging violations of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, is adequately pled, in part.  (Dkt. No. 1-1 ¶¶ 58-68.) To maintain a claim under the UCL, a plaintiff must allege that she has suffered (1) economic injury (2) as a result of the alleged unfair business practice.  *See Kwikset Corp. v. Sup. Ct.*, 51 Cal. 4th 310, 323 (2011).  As the language of that statute suggests, a plaintiff may proceed under the UCL on three possible theories.  First, "unlawful" conduct that violates another law is independently actionable under Section 17200.  *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999).  Alternatively, a plaintiff may plead that defendants' conduct is "unfair" within the meaning of the several standards developed by the courts.  *Id.* at 186-87 (finding of unfairness must be "tethered to some legislatively declared policy or proof of some actual or threatened impact on competition"); *Camacho v. Auto. Club of So. Cal.*, 142 Cal. App. 4th 1394, 1403 (2006) (applying test for violations of § 5 of the Federal Trade Commission Act to evaluate unfair business acts or practices); *McKell v. Wash. Mut., Inc.*, 142 Cal. App. 4th 1457, 1473 (2006) ("[B]usiness practice is unfair within the meaning of the UCL if it violates established public policy or if it is immoral, unethical, oppressive or unscrupulous and causes injury to consumers which outweighs its benefits[.]"); *Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 736 (9th Cir. 2007) (requiring, in consumer cases, "unfairness be tied to a 'legislatively declared' policy" or that the harm to consumers outweighs the utility of the challenged conduct). Finally, a plaintiff may challenge "fraudulent" conduct by showing that "members of the public are likely to be deceived" by the challenged business acts or practices.  *In re Tobacco II Cases*, 46 Cal. 4th 298, 312 (2009); *Daugherty v. Am. Honda Motor Co., Inc.*, 144 Cal. App. 4th 824, 838 (2006) (elements of violation of UCL for "fraudulent" business practices are distinct from common law fraud).  Here, the FAC purports to invoke the latter two theories:  that Screen Gems-EMI's royalty payment practices are both an "unfair" and a "fraudulent" business practice.  Only the "unfair" allegation is sufficiently pleaded.

Among the standards that renders a business practice "unfair" for the purposes of the UCL is if the conduct "violates established public policy or if it is immoral, unethical, oppressive or

United States District Court
Northern District of California

1    unscrupulous and causes injury to consumers which outweighs its benefits." *McKell*, 142 Cal.

2    App. 4th at 1473.  To test whether a business practice is unfair, the court must weigh the utility of

3    the defendant's conduct against the gravity of the harm to the alleged victim.  *Bardin v.*

4    *Daimlerchrysler Corp.*, 136 Cal. App. 4th 1255, 1268 (2006) (citations omitted).  The FAC meets

5    this standard because Plaintiff alleges that she has suffered an economic harm—that is,

6    significantly reduced royalty payments—as a result of Screen Gems-EMI's unfair billing

7    practices.  Moreover, contrary to Screen Gems-EMI's argument, a plaintiff may bring a UCL

8    claim even where it overlaps with a concurrently brought breach of contract and breach of the

9    implied covenant of good faith and fair dealing claim.  *See, e.g.*, *Leghorn v. Wells Fargo Bank,*

10   *N.A.*, 950 F. Supp. 2d 1093, 1118-21 (S.D. Cal. 2013).

11       A claim for relief from "fraudulent" conduct under the UCL "focuses on the likely impact

12   of defendants' alleged deceptive conduct on members of the public."  *Garcia v. Sony Comp.*

13   *Entm't Am., LLC*, 859 F. Supp. 2d 1056, 1062 (N.D. Cal. 2012) (citing *In re Tobacco II Cases*, 46

14   Cal. 4th at 312).  "To be actionable, a 'fraudulent' representation may include a false statement, or

15   one which, though strictly accurate, nonetheless has the likely effect of misleading or deceiving

16   the public."  *Id.* (citing *McKell*, 142 Cal. App. 4th at 1471); *see also Newsom v. Countrywide*

17   *Home Loans, Inc.*, 714 F. Supp. 2d 1000, 1012 (N.D. Cal. 2010) (noting that the focus of a

18   fraudulent UCL claim is that the defendant's conduct is "likely to deceive" (citation omitted));

19   *Boschma v. Home Loan Ctr., Inc.*, 198 Cal. App. 4th 230, 252-53 (2011).  Notably, a fraudulent

20   UCL claim is subject to Rule 9(b)'s heightened pleading standard.  *Kearns v. Ford Motor Co.*, 567

21   F.3d 1120, 1125 (9th Cir. 2009).

22       Here, Plaintiff's fraudulent prong UCL claim fails because she has not alleged sufficient

23   facts showing that the public is likely to be deceived by Screen Gems-EMI's conduct.  The FAC is

24   premised on the Agreement between Plaintiff's spouse and Screen Gems-EMI and does not

25   specifically allege that Screen Gems-EMI engages in the same conduct as to other songwriters or

26   how that conduct is fraudulent.  Accordingly, the UCL claim is dismissed with leave to amend to

27   the extent it is premised on fraud.

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4.      Fourth Cause of Action:  Declaratory Relief

In the fourth cause of action, Plaintiff seeks declaratory relief.  (Dkt. No. 1-1 ¶¶ 69-72.)
Defendant contends that this cause of action should be dismissed as derivative of her other claims.
(Dkt. No. 9 at 22.)  "A claim for declaratory relief is not a stand-alone claim, but rather depends
upon whether or not Plaintiff states some other substantive basis for liability."  *Nguyen v. JP
Morgan Chase Bank*, No. SACV 11-01908 DOC (ANx), 2012 WL 294936, at *3-4 (C.D. Cal.
Feb. 1, 2012) (citing *Glue-Fold, Inc. v. Slautterback Corp.*, 82 Cal. App. 4th 1018, 1023 (2000)).
Because Plaintiff's substantive claims are adequately pled, so too is her claim for declaratory
relief.

5.      Fifth Cause of Action:  Accounting

Plaintiff's final cause of action seeks an accounting.  (Dkt. No. 1-1 ¶¶ 73-76.)  The parties
do not appear to dispute that if Plaintiff prevails on her breach of contract or implied covenant
claims, an accounting may be an appropriate remedy.  Accordingly, the Court will not dismiss the
accounting claim although it is more akin to a remedy than a cause of action.

* * *

The Court notes that its conclusions as to the 12(b)(2) and 12(b)(6) motions are not
inconsistent.  First, they address alter ego allegations as to different entities:  Screen Gems-EMI
and EMI and EMI North America on the personal jurisdiction motion versus Screen Gems-EMI
and affiliated foreign sub-publishers on the failure to state a claim motion.  Second, on the
personal jurisdiction motion, the Court was required to consider Defendants' evidence whereas on
the 12(b)(6) motion the Court was prohibited from considering Defendants' evidence.  Third, the
legal standards for each motion are different.  And finally, the Court did not allow jurisdictional
discovery because no inequitable result will occur if neither EMI nor EMI North America is
required to appear in this lawsuit, and not because no amount of discovery could ever validate
Plaintiff's alter ego allegations.

### CONCLUSION

For the reasons explained above, EMI and EMI North America's motion to dismiss for
lack of personal jurisdiction is GRANTED.  The Court declines to allow jurisdictional discovery

as to these defendants given that there is no dispute that the party to the Agreement at issue—

Screen Gems-EMI—is defending this lawsuit and is able to satisfy any judgment.

Screen Gems-EMI's motion to dismiss is DENIED except as to the fraudulent prong UCL claim.  If Plaintiff chooses to amend her UCL claim, she shall do so on or before March 13, 2015. The Court will hold an initial case management conference on **April 2, 2015 at 1:30 p.m.**

This Order disposes of Docket Nos. 9 and 12.

**IT IS SO ORDERED**.

Dated:  March 2, 2015

_____
JACQUELINE SCOTT CORLEY
United States Magistrate Judge